The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, good afternoon, everybody. Welcome to the United States Court of Appeals for the Fourth Circuit. We have one case on for argument this afternoon, 26-1470 Hall River Assembly v. et al. v. United States Army Corps of Engineers et al. Mr. Tini, whenever you're ready. Thank you, Mr. Chief Judge Diaz, and may it please the Court. I am Derek Tini for the petitioners on this petition for review, and we are here on a motion to stay a pipeline Clean Water Act permit pending review. The case is about whether the Corps of Engineers did its job before authorizing Transcontinental Gas Company, which I'll sometimes call Transco, to cut trenches through scores of streams and wetlands in Virginia and North Carolina. We present two independent grounds on the merits for a stay. First, the Corps failed to independently verify Transco's claim that drilling beneath these streams was impracticable, and that's what we would call the lead question, the least environmentally damaging practicable alternative. Second, the Corps assessed cumulative impacts on scores of stream and wetland crossings without crucial baseline quality data from a single one of them. Either ground independently satisfies the likelihood of success element. On the remaining stay factors, irreparable harm, balance of the equities, and public interest, petitioners can make a clear showing that each strongly favors a stay. But first, the merits. When a pipeline crosses a stream, there are two main ways to do it. You can trench straight through, excavate the streambed using dynamite or backhose, lay the pipe, and then backfill it, bury it back, let the water resume flow. That requires a Section 404 permit under the Clean Water Act from the Army Corps. Alternatively, you can drill underneath the stream. You can dig a bore pit on either of the stream or horizontally under the stream from one bank to the other without touching the stream at all. That activity does not require a Section 404 permit because it does not result in the discharge of fill material into the waters of the United States. The guidelines, the 404b1 guidelines that EPA authored at the direction of Congress, require the presumption that, in this case, drilling under the stream is available and feasible because it has less environmental damage because it doesn't require a discharge. And the guidelines further require the applicant to prove otherwise. And the Corps, under its own regulations, must document its independent review of that information. Can I ask about that? Is it your position that the Corps and Transco have to do that crossing by crossing for each one of these, what is it, over 100 different wetlands and or streams that are at issue here today? Indeed, that is what the law requires. You can look first to this court's decision in Crutchfield versus Hanover County, which recognized that an individual permit, which is what's at issue here, requires an extensive site-specific analysis. You can look at it also, and that's just reflecting what 404 requires. 404 regulates what it calls, and this is from the statute itself, what it calls the specification of disposal sites. And when you look at the 404b1 guidelines, they, in their title, talk about the specification of disposal sites. And then they define that to mean the portion of the waters of the United States where specific disposal activities are permitted. And so it is each discharge, each crossing, is its own disposal site that is regulated by section 404. And therefore, even though it's just done under a single permit, the 100 or more crossings is, in fact, 100 or more disposal sites. And that's why it must be an independent analysis at most. Yeah. So it appears that, at least for some of these, the company and the Corps decided that the non-conventional, the bore, pit, and trenchless crossing or cutting method were appropriate. So is it appropriate to say that by implication, that means that the company and the Corps concluded that, with respect to the others, it simply wasn't feasible? I don't think that that is a fair way to treat the presumption that is prescribed by the 404b1 guidelines. And I think, factually, there may only be one stream that is being conventionally bored. And that is, I think everyone would agree, one of the simpler ways to go under a stream. There are several that are being done through horizontal directional drilling. It's a more complicated exercise. These are larger streams and rivers, the Dan River, the Sandy River, that are so large that they aren't really susceptible to this open cut. And so by their nature, you can't just open cut the Dan River. And so that's why some of them received it. On these smaller streams, though, there has to be that individual site-specific review. And when you look at this record, you cannot tell what the reason was for the rejection. Instead, it speaks at a high level of generality, without site-specific information about cost, about geology. There is also record evidence. Let me take a step back. One of the main reasons that Transco offers for not doing what is called conventional boring is that it maintains that if you dig a bore pit deeper than 20 feet, OSHA regulations require you to design it using a professional engineer. And that is true. But under Transco's position, that alone rendered conventional boring impracticable at sites where it would have to be 20 feet deep or more. Council, why do you say – I think Transco and the government certainly refer to that OSHA regulation. But as I read their papers, I read that as one of several grounds, not a categorical rule. Why do you call – why do you say the OSHA regulatory issue is, according to your colleagues, categorically kind of the end of the story? This is why the site-specific analysis is required. There are some crossings that do offer other explanations besides the 20-foot bore pit. Most of those, many of those, are not riffle and pool complexes, are not wetlands, so there's no presumption. What we are focusing on is the presumption at riffle and pool or wetlands. And let me give you one example of an instance where the bore pit was absolutely determinative. One of the special aquatic sites is a riffle and pool complex that Transco has designated EL-115-VA. Transco's application rejected boring at that location because bore pits would be greater than 20 feet deep. And they expressed – they did express general concerns about hydrogeology. Our comments to Transco and to the Corps on that crossing noted that they were making statements about the geology at that site without having done any site-specific geological analysis. In its response to our comments, Transco doubled down on the bore pit depth and said that it didn't need to do any site-specific geotechnical exploration when the desktop review revealed that bore pits were too deep. And so that's just one example of how this kind of categorical treatment of things had real impacts. Because that is one example of where a crossing was rejected just because of the bore pit depth. They just stopped their analysis and didn't do any further site-specific review. Can I ask you about a sentence at page 23 of the – I believe this is the memorandum of record when it's talking about the no-action alternative that says that Transco evaluated trenchless crossing methods for each stream and wetland source crossed by the project. That suggests that there was an individual analysis of each of those crossings. And then, admittedly, as I think you rightly point out, the rest of the discussion appears to be much more generic and, you know, broader, just general impacts as to why this can't be done relating to the topography of the ground. And also, it seems like one of the big concerns here is just the order of magnitude of costs that are associated with these different alternatives. So can you talk to me about that? Are you saying that that statement alone by itself, it just doesn't meet the requirements of the analysis under the presumption? That is correct, and let me explain why. The presumption is very strong. It has to be clear and convincing evidence. What is – taking costs, for example. The company used an average cost that was actually contradicted by the record and applied that across the board without doing any individual cost analysis at the streams that we are citing in our brief. And so, for example, at the I-40 bore where cost was one of its considerations, the core rejected it. I'm sorry, Transco rejected and the core approved the rejection of a trenchless crossing for streams and wetlands there without any idea of what it would actually cost on the ground. These things have to be looked at on a stream-by-stream basis in order to know, okay, well, which one is it cost prohibitive? Remember, practicability looks at the question of whether it's capable of being done, taking into consideration technological limitations, cost, things like that. But it also has to look at the project purpose and whether it's capable of being done. Just because something is more expensive. Yes, Your Honor. I understand that the practicality had a lot more aspects to it. And, for instance, the time, while the cost they put in evidence suggests that the overall cost would be about four times as much, they said the time would be 12 times as much. And they also indicated that the environmental impact may not even be any different. They demonstrated that by trenching, they'll be there, they take off the original soil and set it aside, and they dig the trench, lay the pipe, and then put the other soil back. And they said the history of that type of method was very beneficial. And they put in evidence about that, and that it would only take two days to cross most of these streams, whereas the boring is much more expensive and takes much longer. This is all we're talking about practicality now, and this is all against the background that this was a permit authorized in the context of a shortage of electricity and energy. It was authorized under a special program because we have a shortage. And so the public interest is very strong to accommodate, especially the time considerations, which they put in evidence to suggest it was 12 times as much. And then if you were doing the boring all the way through, it would be over 20 times as long. It would take 13 years. Isn't that what they put in or something like that? So what we're dealing with there, Your Honor, is a logical error in that what they are doing is assuming that you did a bore or a trenchless crossing at every location, and then they added all that up for the time and the money. But that is not what we are asking for here. You have to look at it on a site-specific basis. So it's not what is being looked at is they're able to magnify things well beyond what the actual cost would be to honor the presumption that the law requires. As far as the energy emergency. Just a minute. I'd like to address you. I mean, your suggestion is that they had to have a separate document or page or analysis for every stream, whether there are 140 streams or whatever there were. And whereas they viewed each stream and they considered that the general approach of trenching at the cost of taking around two days, they described how it would be done. You take off the top layer of soil and stones and set it aside. You trench the stream, lay the pipe, and then cover it back up. And then they put in evidence that suggests that the stream resumes fairly non-impact conditions within a very short time and as short as a few hundred feet downstream. I mean, this is like a child who's digging harbors at the side of the stream and putting the mud into the stream. It goes downstream a little ways and then settles out. Theirs is on a larger scale than that, but it's a process that seems to me would be applicable to streams of certain sizes. Other situations which they examined, they did determine that boring was necessary, and they have specified that, too, and shown that. I don't quite get the notion that stream A and B and C and D, which are all similar in character, cannot be addressed by a method that's applicable to all those streams. The result of accepting less than a stream-by-stream analysis in an individual permit would encourage applicants... Well, there's no suggestion they didn't examine it on analysis. In other words, they made a decision as to how to approach each stream, but they threw them into larger categories. Some were crossing wetlands, and they described that. Others were crossing streams, and they said trenching was just as good as boring and much cheaper and much shorter in time, and that that, therefore, was much more practical. They also talked about the difficulty in boring many of these streams where it was sandy and stony, and there could be a backfill and flooding of the boring. So there's a lot of record here, and the question is, is this a threat to the environment of the kind that requires this project to be halted and the construction to be stopped at a very large cost? I see that I'm about out of time. May I respond to the question? Absolutely. Go ahead. Thank you, Your Honor. Working backwards, the scope of the environmental harm, a prior panel of this court has already concluded that the harms that are caused by trenching through streams under a permit that was unlawfully issued does outweigh the costs to the company, and that is Sierra Club versus United States Army Corps of Engineers, 951F3D281. The other issue is there is also record evidence that when things go wrong with one of these crossings, they go majorly wrong. It is not child's play, I would offer to the court. For example, one stream, and this is in the record, there was a stream in West Virginia where the pipeline company ended up creating a 19-mile-long turbidity plume. That's not hundreds of feet. That's not a minor impact. The fish were impacted by that discharge. The problem with that argument is that this was considered by FERC in its NEPA analysis, and they came to certain conclusions, and it seems to me it's your burden now to demonstrate that their conclusion was wrong. But the company came forward and demonstrated with their data and their studies what the impacts were and what the methodology was, and at that point, if you think it's inadequate, then you have to demonstrate, but you haven't pointed out that any stream that they wished to trench was going to cause a catastrophe. Your Honor, we are not challenging the FERC EA, or Environmental Impact Statement, and in fact the Corps did not adopt that and performed its own NEPA analysis. What we are challenging is the presumption, the rebuttable presumption, that there are less environmentally damaging practicable alternatives, and there is no question that boarding under a stream has less damage to the stream bed than trenching through it. And so even if it is a question of minor versus none, none still matters. Did you put on any evidence to suggest that it wouldn't take four times as much money or 12 times as much time to do what you're advocating? Your Honor, we did in fact present such evidence. This was not an open hearing. This was done through public comment, but we did present evidence of the Mountain Valley Pipeline and the cost that it had for each of its trenchless crossings, and I think the average cost there of an open-cut crossing was nearly $100,000 in comparison to the $40,000 that Transco claims. So we do have evidence that they have exaggerated the cost, and we have also worked hard to demonstrate that we are not asking them to use this at every crossing. We are looking at the riffle and pool complexes, and that's where the analysis fell short. I see that I'm well over my time. Unless the court has any further questions, we would respectfully ask. Yes, Judge Quattroba. Chief Justice, do you mind if I ask one question? Fire away. Okay. Counsel, you mentioned or you stated in your argument that the government or Transco must rebut the presumption by clear and convincing evidence. Yes. In your briefs where you cited that, you referred to some Tenth Circuit cases. Is there any binding law on us that says their burden is clear and convincing evidence? It is in the regulation itself, and yes, you are correct. The cases that we rely upon are Tenth and I think maybe Eighth or Ninth. We do not have a Fourth Circuit case that speaks to that. Did you say the regulation specifies clear and convincing evidence? The regulation at 40 CFR 230.10A3 says that the presumption applies unless clearly demonstrated otherwise. The judicial gloss is what frames it as clear and convincing evidence that the courts are putting on it, but the language of the regulation says unless clearly demonstrated otherwise. That is the source of Transco's burden is the regulation at 230.10A3 as interpreted by a greater Yellowstone coalition and its progeny. Thank you. Chief, can I ask one more question? Yes, please. The stay here has four components to it, and there are two of them that I found fairly important that weren't addressed at all in your papers. One was the injury to Transco in halting the project at this point. You basically had one sentence at the end of your motion that addressed that and said it just wouldn't. And then the public interest, you said, again, just one sentence, this would be in the public interest, whereas the record shows that the public interest in this was not to halt it, that there is an emergency energy shortage, and that this was authorized under that program to facilitate the increased energy that this pipeline would provide. That was a strong public interest for the public, and that wasn't addressed at all. But they said they have spent $56 million to date, and they have workers, hundreds of workers on site that would all be put in limbo. They're down there working, and they would all be put in limbo, and yet there is no address as to how we address. Basically, you want an injunction to stop the project while the appeal is going, and to have an ongoing project like that requires we need to cover all four of the factors, it seems to me, of a stay, and under, as you know, under this, I presume this is under Federal Rule of Appellate Procedure 8, and it seems to me in circumstances like this where we have large amounts of money that are going to be wasted, if not wasted, yeah, wasted for a transco, it seems to me that you would have to be prepared to put up a bond, maybe $100 million or so in order to cover the cost of damage by the delay. How do you address the public interest and the injury to transco by stopping inmateous race? Thank you, Your Honor. I think there are at least three components to your question. One is about the bond, one is about the public interest factor, and then one is about the harm to transco, and I'll take each in turn. On the bond, the requirement for a bond has been held to be waivable, and at this point neither the court nor transco have requested a bond, so I believe that that issue has been waived. Regardless if it's been waived or not, there is a multitude of precedent from multiple circuits that holds that bonds, when parties are working in the public interest as environmental groups do, that frequently the bond element is reduced to a de minimis amount. And so I think the bond element has been waived to the extent it's not. I think that this would serve the public interest exception to the bond requirement, wherein a de minimis, pardon me, or nominal bond would be permissible under established precedent. Turning to the public interest, with regard to the energy emergency, transco itself, when the court said, hey, looks like you've got an energy project here, would you like us to use our expedited process, this is in the record. Transco told the court, no, we want you to use regular process. And I think the reason for that is the processes that would have been administered under the energy emergency order would have been unlawful. We didn't challenge that here because they didn't actually apply those processes at transco's request. On the public interest, Congress has settled this. As this court held in Sierra Club v. U.S. Army Corps of Engineers, 981 F3D at 264, the Natural Gas Act yields to the Clean Water Act in the public interest analysis. And Congress made that clear when it preempted regulation of natural gas pipelines, except in the instance of the Clean Water Act, the Coastal Zone Management Act, and the Clean Air Act. So Congress has already done the public interest. Yes, Your Honor. This was pursuant to an executive order of the President, the emergency, and he happens to be over both agencies, so to speak. But there is a clear energy problem these days, and if we were to halt this project, we would certainly have to take that into account. The fact that the process for approving the permit was under one or the other doesn't mean it's not an emergency permit and that it doesn't serve the public interest in the short energy supply. Your Honor, there is no congressionally granted authority that would allow the executive to waive the requirements of the Clean Water Act in the way that you are proposing. I'm not proposing any waiver. I'm proposing a national emergency, and he goes into quite a bit of detail about the shortage of energy, and this permit was issued in furtherance of that national emergency. And this has not been discussed by you at all, yet the public interest is a very important factor. We did not discuss it at all, and I would argue that it's been waived in two ways. Transco, in fact, requested that this not be treated under the energy emergency order.  That's the procedure. That's not whether the permit was issued as a national emergency. It's all gone fairly quickly. I mean, this process, most of it occurred in 2025, and the authorization was, what, January, late January of this year? It was February 19, 2014. February, yeah, so it's all gone fairly quickly. And the argument that a certain process was used, there might be a lot of reasons for that, but that doesn't deter from the public interest in this project. But Congress has defined what the public interest is, and Congress has not given the President of the United States the authority that he purported to wield in the executive order. We would have briefed that if it had gone to the merits. They said we aren't asking you to use the energy emergency order. Had it been used, we would have fully briefed why the executive cannot override congressional requirements in the way notwithstanding any energy emergency. That's not the way the Clean Water Act is written. For the President of the United States to reach out and use energy, I'm sorry, emergency authority, it has to be consistent with the authority granted by Congress, and this is not. Under the Clean Water Act, there are limited instances, and we would be more than happy to brief for your honors why the energy emergency order is unlawful if it's going to turn on the question of the public interest in that way. I don't think that the court should decide that without knowing fully well how President Trump violated the Clean Water Act with that order. All right. Thank you, Mr. Cheney. Thank you, Chief Judge Diaz. Ms. Sprague? May it please the Court, Mary Gabrielle Sprague, for the federal respondents. I'm going to start with the last point Judge Niemeyer was asking about. The court utilized all the procedures. It did not cut corners. The court went through the usual process. It was intent on doing that as efficiently as possible so as to get a permit that would be timely for Transco to begin its work. There are many conditions of the permit to Transco, including time when it can cut trees, which I believe was March and April. Mr. Sibley can address that. There were not corners cut, but there were long hours worked to get this application processed. It was a very large application package because Transco did a very good job of providing documentation, reports, many analyses to support it. Can I ask a question about this crossing-by-crossing, stream-by-stream analysis? Mr. Cheney's point seems to be, and correct me if this isn't the law, but Transco's submission and then the court's response had to go down chapter and verse by stream. Stream A, for example, here's why traditional cross-fringing isn't sufficient, or here's why bore pits would be appropriate here, then move on to the next stream and the next stream and the next stream. How do you see how this analysis should go? Is he right when he says that the company and the Corps of Engineers had to do that? Your Honor, the Corps effectively did that. You can see the little stuff there. So you agree that they had to do that in some way? Yes. Okay. But there's the rule of rationality that if you have similar conditions at similar streams, then you don't have to reinvent the wheel for every one. But, in fact, Transco identified the crossings that would be practicable for horizontal directional drilling, HDD, and that was explained in detail in their pipeline installation alternatives analysis, what they call the crossings analysis. It's Exhibit 8 to the petitioner's motion. And the text of that is a discussion of the general considerations, which is where you start because that applies to all the crossings. And then Appendix A is a crossing-by-crossing chart. You can only read it on a computer because when you print it out on a piece of paper, there's too much data to read it. But it has all of the geographical sediment type, what kind of stream it is, and, importantly, the depth of the bore pits at the entry and the exit, and the depth to groundwater is extremely important because the danger here is from the groundwater. So, counsel, could I follow up on that? That's the way it appeared to me that the report submitted by Transco had crossing-by-crossing, if you will, data. The CORE's memorandum, or I forget the exact name of it, but the document that granted the permit did not go crossing-by-crossing from my read. It described it more generally. First of all, am I right about that in terms of just the facts? Yes. The narrative part of the document is 76 pages, and that does not have a chart in it, crossing-by-crossing. The responses to comments part of it, which is 60 pages, is part of the decision, and it references all these documents that have crossing-by-crossing analysis. And these documents were part of the application, or they were submitted by Transco in October 2025 as additional information to consider. So the CORE considered all of these documents in making its decision, and those documents are clearly referenced. The appendices to the crossing analysis are quite voluminous and explain the rationales for selecting open-cut, rejecting boring except in one circumstance, and it explains why and why it chose the blue locations. I'm sorry to interrupt you, but I just wanted to make sure I'm closing the loop on your position here. It sounds to me like what you said earlier, that some crossing-by-crossing analysis must take place, but you must be also saying, or else the report would fail, that the final report doesn't need a checklist of each crossing that we look at the record as a whole to see whether that's done. That's correct. Is that your understanding of how we consider whether each site has been considered? That's correct, Your Honor. You can discern the reasoning for the decision from the record as a whole, and you don't really have to go hunting without guidance. The memorandum for the record guides you to those additional documents that have those specific spreadsheets in them with the site-by-site information to apply the considerations to the specific data. If I could ask a separate question, I asked your colleague about the clear and convincing standard that the petitioners say must be met. What's the government's position on that? Well, the regulation says clearly demonstrated, so that's what we apply. Our position is that TRANSCO's information did clearly demonstrate that its proposed crossing methods were the least environmentally damaging practicable alternative for a few reasons. The board pits, I think, are pretty easy to dispense with. They're routinely used when a pipeline has to go under a road in dry conditions, but it's a completely different ballgame when you're needing to get eight feet below a stream or a wetland. And, you know, the stream is typically lower than the banks, so you have to set up your board pits on the banks and you have to come down to stream level, and then the top of it is eight feet below stream level, so it's a 42-inch diameter pipe, so you have to get down even farther. You're working in the groundwater in a big pit with the danger of collapse if the sides cave in and danger of gradual filling up with groundwater and catastrophic flooding. Fortunately, it doesn't happen that often because companies simply don't do board pits under streams where there's going to be a risk that you're going to lose your stream into the board pit and drown your worker. So it's not practicable, and the evidence also demonstrates that it's not even in this circumstance the least environmentally damaging because there are best management practices, all kinds of conditions to protect the stream, prepare the stream, protect the stream from the heavy equipment. They lay down timber mats and other mats. They save the top foot of the stream sediment separate so that can be replaced. These smaller streams can be done in one to two days. You put your stream substrate back in. You stabilize the banks. Then you let the water flow. Plus, there are three years of monitoring that Transco has committed to to make sure everything went well. And if I could just continue a bit longer, there's more and more evidence all the time that this method is the most protective of the stream in these kinds of conditions because you have the construction site for the shortest period of time. If you have a big board pit with these huge piles of excavated material and you get a summer thunderstorm, they're required to have sediment containment measures, but, you know, it's not perfect. And... I have a question that I wanted to ask about the cost element of this. Your colleague Mr. Tini points out, and frankly it was eye-catching to me when I read the memorandum of record, that there's just a complete higher magnitude order of cost comparing the conventional crosscut method, and I'm sure I'm saying that wrong, and the other methods in the millions of dollars compared to tens of thousands for the cheaper alternative. And then, as Judge Niemeyer pointed out, expanded time, years as opposed to months to do this work. But Mr. Tini makes the point is you shouldn't look at that cumulatively because it's not necessarily the case that the more expensive method is going to apply for each of these. His complaint is that neither the cohort nor Transco did enough to justify why at least some of those might not require some additional work and some additional cost. So is that a fair argument? Is it misleading to simply just lump it all together and say it just costs too much as opposed to looking at each crossing individually? Your Honor, that's a fair question. Although Mr. Tini disavows the desire to have all of these crossings cross with trenchless methods. Their arguments essentially say that the burden of using an open-cut method is so high that no matter what you give us, we won't agree. And the court looked at 165 locations, which combined some streams and wetlands together because there actually are more than 165 streams and wetlands. So they looked at locations. And so it would be fair. So looking at 165 locations for assuming each HDD bore took a month, that's where they came up with the 13.5 years. Well, maybe you wouldn't have 13.5 years, but you're going to have years. For one thing, you can't do all of these simultaneously. There's only so many drill rigs and experienced crews that can do this work. So you're going to have to do them sequentially. And the timeframe is so dramatically different that you could argue about how many months and whether it's $40,000 or $100,000 in some instances for an open-cut trench. But when we're looking at the orders of magnitude, and it makes sense because if you can do an open-cut crossing with smaller equipment in a couple of days, it has to be less expensive than doing an open bore where you have to make two massive excavations and it's going to take you two to three weeks. As compared to HDD, Mr. Sibley can confirm, the core set a range of one to six months, but I believe that the HDD bores that are proposed for this pipeline were running three to six months each. So the order of magnitude cannot be overcome by quibbling about a particular figure. All right. Thank you, Ms. Bray. Mr. Sibley? Good afternoon, and may it please the Court, Trey Sibley for Transco. I want to talk about, before my time expires, I do want to talk about what Transco included in its application because I think there is some confusion about the level of analysis that Transco provided. Before I do that, I want to make sure we touch one of the four elements that has not been discussed today regarding a state pending appeal or a preliminary injunction, however you style it, and that's the balance of the equities. By March 2nd of this year, the petitioners here indisputably knew three things. First, they knew the Corps of Engineers had issued Transco a Clean Water Act Section 404 permit that authorized the open cuts that Transco had identified it would need to do in its permit application. The Corps did that notwithstanding the comments that had been raised by Mr. Tini's clients in comments last summer. Second, the petitioners knew that Transco had asked the Federal Energy Regulatory Commission to issue it a notice to proceed with construction. Transco needed that notice issued expeditiously because, as my friend Ms. Bray noted, they needed to complete tree clearing along the right-of-way by the end of March to comply with the time-of-year restrictions, one of the many restrictions that are imposed to ensure this project is built in the most environmentally protective way. That time-of-year restriction exists to protect threatened and endangered bats. So we needed to get started. Third, petitioners knew that the Federal Energy Regulatory Commission had issued that authorization to proceed with construction. Now, Mr. Tini and his clients know how to come to this court and seek a stay pending review in connection with a permit for a pipeline project. They did it just a few months ago in connection with the NBP Southgate project. And yet, and yet, they waited. They waited more than 50 days to come to this court. That is an eternity in connection with a big project like this. During that time period, Transco has fully mobilized across 50 miles of right-of-way in two states. As Judge Niemeyer noted, they've spent tens of millions of dollars on that mobilization, and we are now fully engaged across the project area. Trees have been cleared. Right-of-way has been cleared and grubbed. Some trenching has taken place. Approximately eight to ten stream crossings are underway. The horizontal directional drill under Interstate 40 that Mr. Tini referenced, the pilot hole has now been fully drilled. We're in the process of expanding that pilot hole to 30 inches, and it gradually expands until we get it big enough to put the pipeline through. That's complete. That step, that first step has been completed. Because of petitioner's delay, the cost to Transco. Sorry to interrupt you, Bob, so let me ask about that. So you're right. We're dealing with sophisticated parties here on both sides, and it seems to me that Mr. Tini and his clients certainly have been to this rodeo more than once. You likely have as well. But it seems to me there's a difference between objecting in a common, a notice-in-common environment, and filing a pleading in a court subject to Rule 11 and all the requirements that are attached to that. And from what I understood from Mr. Tini's papers, they didn't have all of the information that they claimed they needed to be able to pursue litigation. So you say they do. That's simply not correct, Your Honor. All of the information they needed was found in the memorandum for record and the appendices to it. And as my friend representing the federal family has noted, that information petitioners had as of the end of February. And these are the same arguments they raised in notice-in-common. And Chief Judge Diaz, these arguments are not new ones. These are the hardy perennials of permit litigation over a project like this. As Mr. Tini notes, this argument that was raised, the argument about consideration of alternative processing methods was raised in the Sixth Circuit in the Cumberland Gas decision. We would refer the court to that decision as an example of how that court at least resolved these particular issues. They had everything they needed. The consequence of the delay to transco is substantial, right? If a state, let's assume that it takes six, the court decides to interstate and it stays in place for six months, that's a nine-figure hit. That's $120 million to transco. And that cost exists. That cost is so high because of the delay. What drives that cost is the need to maintain an open and disturbed construction site over that extended period of time. Now, as my friend Ms. Sprague noted, these big construction sites are – there is a lot of value to getting this done quickly. If you've ever gone through a home renovation or seen a big construction project on your way to work, you know that they disturb a lot of ground. There's a lot of big piles of dirt, thunderstorms that come by. That's what causes harm to the environment. Getting in and getting out is really important. It serves no one's interest for this project to be put on ice for multiple months and that the cost to transco in particular and the cost to the public, the people who live and work near the pipeline, could have been avoided had the petitioners moved more quickly. This court has said in the Quince Orchard case that equity demands that people who are seeking to stop a project like this move quickly. That is an important consideration. It's not hypothetical. Now, if I could turn also quickly to the public interest, Judge Niemeyer, and talk about the executive order. Both of my friends, Mr. Teeney and Ms. Sprague, are correct that, one, that this project is covered by the order and it is needed to meet the demand that's identified in the order. Judge Niemeyer, I take that to be your point. It is also correct that there were procedures outlined in that order to expedite certain types of projects. Mr. Teeney is correct. We said we want to be processed under the ordinary order just quickly. Let's get this done. And the court did move quickly. Getting from permit application to permit issuance in about eight months is expeditious and did meet the substance of the President's order without violating any requirements under the Clean Water Act. Now, if I could turn to that question quickly. Transco, in its permit application, engaged in precisely the crossing-by-crossing analysis that Mr. Teeney says was required. We included the pipeline installation alternatives analysis that, in the body of that, talks in gross about the various methods that could be used, and then, for each crossing, identifies all of the parameters that are relevant for that crossing, and then explains at the end, in summary fashion, admittedly, why we are choosing to use an open cut. That evidence is in the record. It was substantial. It was so substantial that I must apologize to the court. It's Appendix A to my Exhibit 9, and the print is so tiny, you will have no chance of reading it if you print it out. You would need to look at it on a computer and zoom in. But I urge you to do so, because when you do, you will see exactly the analysis that Mr. Teeney says we should have conducted. With respect to the presumption, Mr. Teeney makes a lot of this. There are two kinds of special aquatic sites that appear here. One is these riffle and pool complexes. There's only a handful of sites that even show characteristics associated with those. There's just a few of those. But almost every crossing involves some wetland, and wetlands qualify as special aquatic sites, too. So we assume that every one of these crossings is a special aquatic site, and we provide the evidence, that clear demonstration, for each crossing to overcome any presumption that might apply. Now, you cannot say that TRANSCO did not provide that information in its application. You also cannot say that the Corps of Engineers failed to consider it. We know they did because they asked for more information. They asked for clarification on a few points. TRANSCO responded in detail to that request for information. TRANSCO also provided specific responses to the criticisms leveled by Mr. Teeney and his clients with respect to certain crossings. The Corps explained in its decision document that it reviewed each one of those responses and found them sufficient. All that's required under the APA is that the agency's decision be reasonably explained. And on these topics, both on alternatives and on cumulative impacts, it is clear that the Corps engaged on these questions. So, simply to ask you a question about a critical harm, you and the government seem to be arguing that there's a mismatch in terms of the harms alleged in the papers and the harms alleged in the declarations of the individuals that are part of the litigate. Just an ending problem or it's just not, they haven't made a case for reputable harm because there's just inconsistent arguments? So, I would start with the, I mean, this is an administrative record review case and the court reviews this under the familiar APA standard. And under that standard, it is the petitioner's obligation to show that the Corps' predicate conclusions are arbitrary, capricious, or contrary to law. Now, with respect to these stream crossings, the Corps concluded, North Carolina concluded, Virginia concluded, the Federal Regulatory Commission concluded that these crossings would pose only temporary impacts that are localized in nature. I see that I'm over my time. Chief Judge, may I continue? Bob, you're up. Each one of those agencies concluded that this crossing method does not cause an irreparable impact. It causes only a temporary impact. Mr. Taney and his clients do not argue that that conclusion was arbitrary, capricious, or contrary to law, nor could he fairly. There's ample evidence in the record and ample experience on behalf of the Corps, Transco, other pipeline companies, that when executed properly, these crossing methods work. That means that any farm that they elect, the only permanent impacts to the aquatic environment associated with construction is the conversion of about 2 1⁄2 acres of wetlands across 50 miles of pipeline. Now, critically, none of the petitioners here assign any special interest in those wetlands, and it would be hard to see how they could. The reason why they're converted is because they're on the Transco right-of-way already. Set that aside. Those conversions occur whether you do open cuts or trench. You could trench everything, and you would still have those conversions because it's necessary to maintain the right-of-way. The existing wetlands are forested wetlands, and there's deep roots for trees. There's deep roots that can interfere with your pipe, and that's not safe. That's why those conversions occur. Now, Your Honor, we think for all of these reasons the motion for stay pending appeal should be denied. We think on the merits, they've not demonstrated a likelihood of success in the merits, nor do we think they have satisfied their burden, their high burden under Inkin and Winter and this Court's precedent, as to the other three factors. Thank you. Thank you very much, Mr. Sibley. Mr. Taney? Chief Judge Diaz, I want to, working backwards in part, picking up from where Mr. Sibley was discussing, the temporary versus permanent. The Army Corps and its applicants tend to use those as terms of art, meaning a permanent fill is something that lasts in perpetuity. Temporary generally is anything short of perpetuity. Here, the Corps specifically found that there would be long-term effects to the physical substrate. This is at page 42 of their memorandum for record, and that there would be long-term cumulative effects on the aquatic ecosystem. Those are just a couple of examples. The 404b1 guidelines say the guiding principle should be that degradation of special sites may represent an irreversible loss of valuable aquatic resources. This Court held in Sierra Club v. U.S. Army Corps of Engineers that these very types of harms did constitute irreparable harm. Again, that's at 981 U.S. 251. Regarding the harm to the wetlands, neither Transco nor the government has cited any case that stands for the proposition that you have to tie the harm claimed to the merits itself. In fact, there's contrary law, and I believe it's cited in our reply brief. I'd like to address whether the path is discernible and the sequence of events. First, let's start with the facts. Yes, MVP provided an application. Yes, it included Appendix A. But it's important to remember the Corps' reaction to that. The Corps sent Transco a letter that said that it is unclear, based on the information provided, that the preferred alternative is the LEDPA when compared to other alternatives. Essentially, the Corps looked at Transco's application and concluded that the presumption had not been rebutted. They asked for more information. More information was provided. Ms. Sprague talked about it. Then she said you can reasonably discern the path. The path that's reasonably discernible is Transco's. But what the law requires is a discernible path by the agency. What the agency actually said in response to the LEDPA issues, and this can be found at 13-6. This is Exhibit 5 to our motion. It's CMF ECF number 13-6, page 123. It's part of Appendix A. There, Transco provides its response to what is called SELC-5. That is the environmentalist's comments about the presumption and the Corps' response in its entirety. This is how we're supposed to discern the path. The applicant provided the Corps an alternatives analysis and avoidance minimization statement for the project, which will be reviewed pursuant to Section 404b-1. The only thing apparent on this record is a commitment to review. The results of that independent verification are not, and that violates the Corps' regulations at 33 CFR Part 325, where this is the independent verification requirement that those courts cite. In all cases, the district engineer should document in the record the Corps' independent evaluation of the information from the applicant and its accuracy. And so the Corps' analysis falls short of its own requirements here, and that leaves this court without any way to analyze the decision that the Corps actually made. Finally, I want to turn to something the Corps said. I'm sorry, that Ms. Spragues had an argument today. She represented that companies just don't do this. They don't dig bore pits deeper than 20 feet or that cost tremendous sums of money. The record before the Corps included our exhibit, which was a list, which was MVP, Mountain Valley Pipelines, crossing-by-crossing analysis, that provided the individual cost for each crossing and also included 54 instances, 54, where Mountain Valley Pipeline dug bore pits deeper than 20 feet. Are you talking about Transco? I'm sorry? You keep saying Mountain Valley Pipeline. Are you talking about Transco? Yes, Your Honor. I did misspeak once, and I think I misattributed Mr. Sibley's client, and I apologize for this. This one I am talking about. Well, he might be representing both of them. I don't know. But Transco is the one before us today. It is, but here's why it's relevant. If I may briefly explain. I see that I'm out of time. Go ahead. So we receive the application. We see that this information is missing. We see that Transco has not provided site-by-site information about cost. We see that Transco is announcing that 20 bore pits deeper than 20 feet are just nigh impossible. So we did submit documentation from the Mountain Valley Pipeline that showed that that pipeline in the same region had dug bore pits deeper than 20 feet at 54 locations and that it had costed out each crossing individually to show that that is, in fact, something that could and should be done. I thank you for the extra time, and we respectfully request that the court grant the stay. Well, thank you very much. I want to thank all the counsel for their excellent arguments here this afternoon. It's a very complicated and technical case, and frankly, we need all the help we can get, and I think we got it. So thank you for the argument. We would, as our tradition would dictate, come down and reach you if we were in person. Can't do that. So we want to just thank you remotely and very much appreciate your being with us this afternoon. Thank you very much, Your Honor. You're welcome. You would adjourn court, please. Dishonorable court stands adjourned. God save the United States and dishonorable court.
judges: Albert Diaz, Paul V. Niemeyer, A. Marvin Quattlebaum Jr.